J-S07002-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JESUS RAMOS, | |
| Appellant | No. 289 EDA 2017 |

Appeal from the PCRA Order Entered January 6, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000561-2008

BEFORE: BENDER, P.J.E., PANELLA, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED APRIL 16, 2018**

Appellant, Jesus Ramos, appeals from the post-conviction court's January 6, 2017 order denying, without a hearing, his petition filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  We affirm.

In August of 2009, Appellant was convicted, following a non-jury trial, of third-degree murder, criminal conspiracy, and carrying a firearm without a license.  This Court previously summarized the facts underlying Appellant's convictions, as follows:

> Carlos Ruiz ("Ruiz"), a drug dealer, had been fighting over drug-dealing "turf" with Marcos Martinez ("the victim").  Ruiz was badly beaten by the victim and vowed to take revenge.  On January 3, 2007, appellant drove Ruiz in a burgundy Toyota Camry to the 2800 block of North Swanson Street where the victim lived.  Ruiz spotted the victim and directed [A]ppellant to slow the car down so the victim would think it was someone coming to purchase drugs and draw him to the car.  Appellant

complied and when the vehicle stopped, Ruiz exited the vehicle and attempted to shoot the victim. However, no bullets discharged from the gun as it was locked. The victim fled inside a neighbor's house, and Ruiz shot two bullets through the door. One of these bullets fatally injured the victim. Ruiz ran back to the Camry, and [A]ppellant drove him away from the scene. Neighbors called 911 and reported the shooting, describing the getaway car.

Appellant's ex-girlfriend, Alison Ramirez ("Ramirez"), testified to events that occurred shortly before the shooting. Ramirez explained that on the day in question, [A]ppellant arrived at her sister's home located just three blocks from North Swanson Street. Ramirez had previously obtained a protection from abuse ("PFA") order, so she telephoned 911 upon seeing [A]ppellant. Ruiz, whom Ramirez recognized, then arrived in a burgundy Camry, and [A]ppellant got in the passenger seat. The vehicle left but returned shortly thereafter, and [A]ppellant got out of the car. Police Officers John Boyle and Jason Forsythe responded to the 911 call. Upon arrival, Ramirez pointed to the burgundy Camry at the corner and identified [A]ppellant as the subject of the PFA order. Appellant observed the police and went back to the Camry; however, Ruiz moved to the passenger seat, and [A]ppellant got in the driver's seat and drove off.

While the police were interviewing Ramirez, they received a flash report that a shooting had occurred a few blocks away in the 2800 block of Swanson Street. Upon arrival, the victim was lying outside the front door of his neighbor's home with a bullet through his brain. Investigators found two fired cartridge casings and two fired bullets nearby. Officers Boyle and Forsythe heard over the police radio that the perpetrators had fled in a burgundy Toyota Camry -- the same car that they had just seen [A]ppellant and Ruiz in minutes earlier a few blocks away. The officers returned to Ramirez'[s] home and learned that [A]ppellant lived in the 2900 block of Waterloo Street; upon arrival, the officers saw a burgundy Camry parked across from [A]ppellant's home. A computer check showed that the vehicle was registered to a woman who lived on Horrocks Street.

In the meantime, [A]ppellant telephoned Ramirez and told her that he had just shot someone. Appellant explained that the gun locked as he was trying to shoot, but he managed to get off two shots through the door of a house. Unbeknownst to [A]ppellant, Ramirez'[s] sister, Marangeli Rivera ("Rivera"), was

- 2 -

listening on the other end of the phone. Appellant pleaded with Ramirez to meet with him; she agreed but then hung up the telephone and called 911 to report what she had just heard.

The police instructed Ramirez to go to the police station. Ramirez complied, with her sister accompanying her. While Ramirez was giving a statement to the detectives, Rivera had to leave to pick up her children at school. When she and the children arrived home, she saw [A]ppellant standing on the corner. Rivera called 911 and the police arrived to arrest [A]ppellant for the assault/robbery he had committed on Ramirez the day before and for his continuing violation of the PFA order.

Detective Phillip Nardo testified that he took a statement from [A]ppellant upon his arrest after [A]ppellant waived his *Miranda*[1] rights. Appellant detailed the nature and extent of his involvement in the shooting. Appellant explained that Ruiz had a previous altercation with the "boys on Swanson Street" over drug dealing and knew that Ruiz wanted to "get back at them." For weeks after the fight, Ruiz asked [A]ppellant to give him a gun so he could "fuck these guys up." Three days before the shooting, Ruiz told [A]ppellant that he had secured a gun and had gone over to Swanson Street "to shoot" the victim but did not do so.

[1] *Miranda v. Arizona*, 86 S.Ct. 1602 (1966).

On the day of the murder, [A]ppellant agreed to go with Ruiz to Swanson Street to "get these mother fuckers." While in the car, Ruiz showed [A]ppellant the gun that he was carrying and [A]ppellant stated, "you are going to kill this mother fucker with that." Appellant then admitted that he drove Ruiz to Swanson Street and explained that he "drove real slowly. I wanted to make it look like a buy." Appellant stated that Ruiz had the gun right in his lap. When Ruiz spotted the victim, [A]ppellant followed his instruction to reverse the car slowly and stop. Ruiz then got out of the car and attempted to shoot the victim, but the gun did not fire. Ruiz then fired two bullets through the front door, jumped back into the Camry, and yelled to [A]ppellant, "get off the fucking block." Appellant obeyed and drove off "real fast."

The police also obtained a statement from Amil Gonzalez, the victim's neighbor who lived at 2837 North Swanson Street. In his January 5, 2008 statement to the police, Gonzalez averred that he was outside of his home when he saw the victim walking towards him from the other end of the street. Gonzalez saw a burgundy car coming up the street at a high rate of speed. The

car stopped in front of his house and the passenger got out.  The victim then ran into Gonzalez'[s] house and closed the door.  The passenger stood by the car and attempted to fire, but the gun misfired.  The man then fired two shots at the door, returned to the car, and left the scene.  Gonzalez found the victim lying behind the door of his home.

The police subsequently showed Gonzalez a photo array; he identified Ruiz as the person who got out of the burgundy car and shot at his house.  When asked if he was certain of his identification, Gonzalez answered affirmatively.  Gonzalez also recounted that Ruiz had sustained an earlier beating at the hands of the victim.[2]

> [2] At the time of trial, Gonzalez was serving a federal prison sentence.  He testified that at the time of the shooting he was inside his house with his wife, Aurelia Delgado.  Gonzalez testified that he heard two gunshots but denied seeing who shot the victim.  However, in a statement to the police on January 5, 2008, Gonzalez gave a different version of events.

> The medical examiner testified that the victim died of a gunshot wound to the brain.  Police Officer Ernest Bottomer of the Firearms Identification Unit testified that the cartridges and bullets came from the same gun.  He also stated that the cartridges found on the scene were consistent with accounts of the shooting.  Counsel stipulated that [A]ppellant did not have a license to carry concealed weapons.

> Prior to trial, [A]ppellant moved to suppress the statement he gave to the police.  A hearing was held and the motion was denied.  Following a joint bench trial with co-defendant Ruiz, both men were convicted of third degree murder, conspiracy, and VUFA.  On October 29, 2009, [A]ppellant was sentenced to concurrent terms of 7½ to 15 years' imprisonment for third[-]degree murder and conspiracy; no further penalty was imposed for [carrying a firearm without a license].

*Commonwealth v. Ramos*, No. 155 EDA 2011, unpublished memorandum

at 1-6 (Pa. Super. filed Feb. 15, 2012) (citations to the record omitted).

Appellant did not file a timely direct appeal from his judgment of

sentence; however, he filed a PCRA petition seeking the reinstatement of his

direct appeal rights, which was granted. He then filed a direct appeal *nunc pro tunc*, and this Court affirmed his judgment of sentence. ***See Ramos, supra***; ***see also Commonwealth v. Ramos***, 46 A.3d 817 (Pa. Super. 2012) (unpublished memorandum). Our Supreme Court denied Appellant's subsequent petition for allowance of appeal on July 16, 2012. ***Commonwealth v. Ramos***, 48 A.3d 1248 (Pa. 2012).

Appellant filed a timely PCRA petition on July 30, 2012. Counsel was appointed, and filed an amended petition on Appellant's behalf alleging that Appellant's trial counsel was ineffective for not calling Appellant as a witness at the pretrial suppression hearing. On September 23, 2016, the PCRA court issued a Pa.R.Crim.P. 907 notice of its intent to dismiss Appellant's petition. After receiving no response from Appellant, the court issued an order dismissing his petition on January 6, 2017. Appellant filed a timely notice of appeal, and he also timely complied with the court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The PCRA court issued a Rule 1925(a) opinion on August 15, 2017. Herein, Appellant raises one issue for our review:

> I.    Did the [PCRA] court err in denying [A]ppellant an evidentiary hearing when … [A]ppellant raised a material issue of fact that trial defense counsel was ineffective in advising … [A]ppellant not to testify at [the hearing on] the motion to suppress [A]ppellant's alleged confession to police?

Appellant's Brief at 2.

We begin by noting that "[t]his Court's standard of review from the grant or denial of post-conviction relief is limited to examining whether the lower court's determination is supported by the evidence of record and whether it is free of legal error." *Commonwealth v. Morales*, 701 A.2d 516, 520 (Pa. 1997) (citing *Commonwealth v. Travaglia*, 661 A.2d 352, 356 n.4 (Pa. 1995)). Where, as here, a petitioner claims that he received ineffective assistance of counsel, our Supreme Court has directed that the following standards apply:

> [A] PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). "Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." [*Commonwealth v.*] *Colavita,* 606 Pa. [1,] 21, 993 A.2d [874,] 886 [(Pa. 2010)] (citing *Strickland*[ *v. Washington*, 104 S.Ct. 2053 (1984)]). In Pennsylvania, we have refined the *Strickland* performance and prejudice test into a three-part inquiry. *See* [*Commonwealth v.*] *Pierce,* [515 Pa. 153, 527 A.2d 973 (Pa. 1987)]. Thus, to prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result. *Commonwealth v. Ali,* 608 Pa. 71, 86, 10 A.3d 282, 291 (2010). "If a petitioner fails to prove any of these prongs, his claim fails." *Commonwealth v. Simpson,* [620] Pa. [60, 73], 66 A.3d 253, 260 (2013) (citation omitted). Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. *See Ali, supra.* Where matters of strategy and tactics are concerned, "[a] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success

- 6 -

substantially greater than the course actually pursued." ***Colavita***, 606 Pa. at 21, 993 A.2d at 887 (quotation and quotation marks omitted). To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." ***Commonwealth v. King***, 618 Pa. 405, 57 A.3d 607, 613 (2012) (quotation, quotation marks, and citation omitted). "'[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.'" ***Ali***, 608 Pa. at 86–87, 10 A.3d at 291 (quoting ***Commonwealth v. Collins***, 598 Pa. 397, 957 A.2d 237, 244 (2008) (citing ***Strickland***, 466 U.S. at 694, 104 S.Ct. 2052)).

***Commonwealth v. Spotz***, 84 A.3d 294, 311-12 (Pa. 2014). "Furthermore, a petitioner is not entitled to a PCRA hearing as a matter of right; the PCRA court can decline to hold a hearing if there is no genuine issue concerning any material fact and the petitioner is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings." ***Commonwealth v. Taylor***, 933 A.2d 1035, 1040 (Pa. Super. 2007) (citing Pa.R.Crim.P. 907(1); ***Commonwealth v. Hardcastle***, 701 A.2d 541 (Pa. 1997)).

Here, Appellant contends that the PCRA court erred by not conducting an evidentiary hearing on his claim that trial counsel was ineffective for advising him not to testify at the suppression hearing. According to Appellant, the discussion in "his *pro se* PCRA [p]etition shows that his statement was coerced by the police and taken in violation of his constitutional rights." Appellant's Brief at 7.[1] Appellant further argues that his trial counsel had no

_____

[1] Notably, Appellant does not set forth, in the Argument section of his brief, any discussion of the facts supporting his coercion claim. However, he

reasonable basis for advising him not to testify at the suppression hearing, where Appellant's "testimony would have proved that his statement was coerced and secured in violation of his state and Federal Constitutional rights." *Id.* at 6. Finally, Appellant avers that he "was prejudiced by counsel's advice because he lost the opportunity to have the statement suppressed and not used against him at trial and therefore lost the opportunity to win an acquittal." *Id.* According to Appellant, he has demonstrated that a genuine issue of material fact exists regarding whether trial counsel rendered deficient representation in this respect, thus warranting a PCRA hearing.

In rejecting Appellant's ineffectiveness claim without a hearing, the PCRA court reasoned as follows:

> As noted above[,] Appellant gave two inculpatory statements which were introduced at trial: One to police and one to Alison Ramirez. In the statement to Ms. Ram[i]rez, Appellant claimed to be the shooter. In the police statement[,] Appellant said that he was the driver and the co-defendant was the shooter. The greater weight of the evidence convinced this [c]ourt that the co-defendant was the shooter and Appellant, knowing his passenger's intent was, in fact[,] the driver. Accordingly, even had Appellant testified [at the suppression hearing] and convinced the suppression court to grant the motion [to suppress his

_____

attaches to his brief a copy of several pages of his *pro se* petition. Therein, Appellant alleges, *inter alia*, that he was held for several hours before and during his interrogation, and he was at no point provided with food, water, or access to a toilet. Appellant also claims that the officers who conducted the interrogation called him derogatory names, were physically confrontational, and ignored his repeated requests for an attorney. According to Appellant, he only provided his statement "[a]fter thirty plus hours of detention and isolation[,]" and after being told that he "would be given food, a soda, [and] whatever he needed" if he provided the statement. *See* Appellant's Brief at C-4 (reproduction of Appellant's *Pro Se* PCRA Petition, 7/30/12, at 7).

statement to police], this [c]ourt still would have heard Appellant confess to being the shooter. The end result would not have changed. Under the facts of this case[,] both the shooter and the accomplice/driver were guilty of [t]hird[-d]egree [m]urder and the related offenses. The sentences would not have changed. Therefore[,] no hearing was necessary before this [c]ourt denied the baseless PCRA [p]etition.

PCRA Court Opinion, 8/15/17, at 6-7.

Aside from the bald assertion that he would have 'won an acquittal' if his statement to police had been suppressed, Appellant offers no developed discussion to refute the PCRA court's contrary conclusion. Moreover, our review of the record supports the PCRA court's determination that the evidence admitted at trial, aside from Appellant's confession to police, proved Appellant's involvement in the murder of Marcos Martinez, especially Appellant's confession to Ms. Ramirez.[2] Accordingly, we ascertain no abuse

---

[2] Our conclusion in this regard is not swayed by Appellant's "Petition to Remand to Trial Court for Consideration of Newly Discovered Evidence," which Appellant filed with this Court on April 4, 2018. Therein, Appellant claims to have discovered, "sometime in March 2018," that "Detective Phil Nordo[,] who took [] [A]ppellant's alleged confession has been suspended with intent to [d]ismiss for misconduct and is on the [District Attorney's] list of policemen not to call as witnesses." Petition, 4/4/18, at 1 (unnumbered). Appellant avers that "[t]he issue that is before this [C]ourt is that Detective Nordo coerced [Appellant's] alleged confession and that [Appellant] is entitled to an evidentiary hearing on whether trial [] counsel was ineffective for not calling … [A]ppellant as a witness at the suppression hearing." *Id.* Appellant asks this Court to remand for the PCRA court to determine if this new information about Detective Nordo warrants an evidentiary hearing.

We conclude that remand is unnecessary. First, the recently released information about Detective Nordo's misconduct cannot demonstrate that Appellant's trial counsel acted ineffectively by advising Appellant not to testify at the suppression hearing. Counsel could not have known that the District

of discretion in the PCRA court's conclusion that Appellant failed to prove that a genuine issue of material fact exists regarding the prejudice prong of the ineffectiveness test. As such, the court did not err in denying his petition without a hearing.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/16/18

---

Attorney's Office would accuse Detective Nordo of misconduct in March of 2018. Moreover, this information about Detective Nordo's alleged misconduct would have, at best, resulted in the suppression of Appellant's confession. However, for the reasons stated *supra*, the omission of that cumulative evidence from Appellant's trial would not have changed the outcome, where Appellant also confessed to Ms. Ramirez. Accordingly, Appellant has not demonstrated that our remanding for the PCRA court to examine this new information is warranted. Thus, we deny his "Petition to Remand to Trial Court for Consideration of Newly Discovered Evidence."